UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIAM A. BROWN, et al.,

    Plaintiffs,

v.                                                    CASE NO. 8:15-cv-325-T-23TGW

BOTTLING GROUP, LLC d/b/a THE
PEPSI BOTTLING GROUP, et al.,

    Defendants.
_____/

**ORDER**

In this products-liability action, William Brown sues (Doc. 1) for injuries he suffered while repairing a crane in a warehouse owned by Bottling Group, LLC, d/b/a The Pepsi Bottling Group (Pepsi). The manufacturer of the crane, Westfalia Logistics Technologies GmbH & Co. KG, a German company, and its successor, Westfalia Logistics Solutions Europe GmbH & Co. KG (Westfalia) move (Doc. 32) under Rule 12(b)(2), Federal Rules of Civil Procedure,[1] to dismiss all claims for lack of personal jurisdiction. The plaintiffs and Pepsi respond (Doc. 50, 51), and Westfalia replies (Doc. 53).

---

[1] Initially, Westfalia moved under Rule 12(b)(4) and (5) to dismiss for insufficient process and insufficient service of process but later withdrew (Doc. 42) those portions of the motion.

After Westfalia moved to dismiss, the plaintiffs amended (Doc. 60) the complaint. The parties concur (Doc. 56 at 2) that the motion to dismiss retains vitality and applies to the amended complaint without re-filing.

## BACKGROUND

The Pepsi warehouse uses an "automated storage and retrieval system," which includes two cranes designed and manufactured by Westfalia. (Doc. 60 at ¶¶ 7, 15) Brown's employer, Westfalia Technologies, Inc., (WTI) installed and serviced the cranes.[2] (Doc. 60 at ¶¶ 10, 16–17)

Each crane holds a vertical lift system (VLS) platform, which carries product vertically and horizontally throughout the Pepsi warehouse. (Doc. 60 at ¶ 9) The complaint alleges:

> 11. The two SRMs were shipped from Germany with safety brackets that are to be attached to an SRM's solid vertical masts as braces to secure the VLS platform in a stable, static position during some maintenance procedures.
>
> 12. The SRM was ordered with safety brackets designed to be bolted into the solid tube masts.
>
> 13. The SRMs actually delivered to Defendant Pepsi in Florida did not include the correct safety brackets, but instead included brackets with raised nubs designed to fit into mast indentations and be secured by friction.
>
> 14. The safety brackets actually delivered and installed with WLS's SRMs were not properly matched with the ordered brackets. They were not designed to fit securely into the SRMs' solid tube masts.

On March 10, 2011, Brown was repairing one of the cranes. (Doc. 60 at ¶¶ 35, 54) The VLS platform was lowered to the maintenance position, approximately eight feet off the ground. (Doc. 60 at ¶ 47) A Pepsi employee

---

[2] Pepsi files (Doc. 61) third-party claims against WTI. The plaintiffs assert no claim against WTI.

installed the non-conforming safety brackets.  (Doc. 60 at ¶¶ 42, 47)  Another Pepsi employee negligently activated the motor that powered the VLS platform.  (Doc. 60 at ¶¶ 42, 49, 55)  The downward force of the two-ton VLS platform overcame the capacity of the non-conforming safety brackets.  (Doc. 60 at ¶¶ 53, 56)  The platform crashed to the floor, injuring Brown.  (Doc. 60 at ¶ 56)  Brown's co-worker, Nathaniel Sullivan, was crushed to death.  (Doc. 60 at ¶ 56)

Brown asserts claims against Westfalia for strict product liability (Count I), negligence (Count II), and breach of contract, breach of the warranty of merchantability, and breach of the warranty of fitness for a particular purpose (Count III).  Also, Brown asserts a negligence claim against Pepsi (Count IV).  Brown's wife, Linda Hazlett-Brown, claims loss of consortium (Count V).  Pepsi cross-claims (Doc. 63) against Westfalia for strict product liability, negligence, breach of contract and warranty, contractual indemnity, and common-law indemnity.  Westfalia moves to dismiss both the plaintiffs' claims and Pepsi's cross-claims.

## DISCUSSION

"A federal court sitting in diversity may exercise jurisdiction over a defendant only if two requirements are met: (1) the state long-arm statute, and (2) the Due Process Clause of the Fourteenth Amendment."  *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 (11th Cir. 1999).  "[T[he plaintiff bears the burden of establishing a prima facie case of jurisdiction over the movant, non-resident defendant."  *Morris v. SSE,*

*Inc.*, 843 F.2d 489, 492 (11th Cir. 1988).  "A prima facie case is established if the plaintiff presents sufficient evidence to defeat a motion for a directed verdict." *Morris*, 843 F.2d at 492.  "[W]here the evidence presented by the parties' affidavits and deposition testimony conflicts, the court must construe all reasonable inferences in favor of the non-movant plaintiff."  *Morris*, 843 F.2d at 492.

    Section 48.193(1)(a)(6), Florida Statutes, states:

> Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury . . . Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

The complaint sufficiently alleges that Westfalia caused injury to Brown at the Pepsi warehouse in Florida, that the injury related to a defective crane manufactured by Westfalia and shipped from Germany, and that at the time of the injury the crane was used to move Pepsi's products.  (Doc. 60 at ¶¶ 11, 15, 17, 32, 56, 67)  Westfalia raises no meaningful challenge to the application of this section.

    When a long-arm statute provides jurisdiction over a claim, personal jurisdiction exists with respect to each claim that arises from "the same jurisdiction generating event."  *Cronin v. Wash. Nat'l Ins. Co.*, 980 F.2d 663, 671 (11th Cir. 1993).  Because each of the plaintiffs' claims against Westfalia arises from the alleged failure to provide the expected, effective safety bracket, jurisdiction is established as to each of the plaintiffs' claims.  (Doc. 60 at ¶¶ 67, 70, 74, 76, 82, 100)

Also, Florida's exercise of specific jurisdiction over Westfalia comports with the demands of due process, which is satisfied if a defendant possesses "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92 (1980) (internal quotation marks omitted). "This two-part test embodies the controlling due process principle that a defendant must have 'fair warning' that a particular activity may subject it to the jurisdiction of a foreign sovereign." *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1545 (11th Cir. 1993).

A defendant's contacts with a forum (1) must relate to a plaintiff's cause of action, (2) "must involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum," and (3) "must be such that the defendant should reasonably anticipate being haled into court there." *Vermeulen*, 985 F.2d at 1546 (internal quotation marks and brackets omitted). A defendant need not be physically present in the state, but its actions must be "purposefully directed" toward residents of the state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (internal quotation marks omitted).

In a products-liability action, the exercise of long-arm jurisdiction requires more than a *consumer's* unilateral movement of the defendant's product to the forum, even if the movement is foreseeable. *World-Wide Volkswagen Corp.*, 444 U.S. at 295, 298 ("respondents seek to base jurisdiction on one, isolated occurrence . . . the

- 5 -

fortuitous circumstance that a single Audi automobile, sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma."). On the other hand, if the sale of a product "is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product" in the forum state, subjecting the manufacturer or distributor to suit if the product results in an injury in the forum state is entirely reasonable. 444 U.S. at 297. A forum may assert personal jurisdiction over a defendant "that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum." 444 U.S. at 298.

After *Volkswagen*, lower courts split on the reach of the stream-of-commerce theory. Some courts held that a defendant was subject to jurisdiction "based on no more than the defendant's act of placing the product in the stream of commerce." Other courts "require[d] the action of the defendant to be more purposefully directed at the forum State." In *Asahi Metal Indus. Co. v. Superior Court of Cal*, 480 U.S. 102, 110 (1987), Justice O'Connor's plurality opinion endorses the latter view:

> The placement of a product into the stream of commerce, *without more*, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of

> placing the product into the stream into an act purposefully directed toward the forum State.

480 U.S. at 112 (internal citations and quotation marks omitted, emphasis added). The plurality determined that the defendant, Asahi, a Japanese tire valve manufacturer, was not subject to jurisdiction in California. Asahi maintained "no office, agents, employees, or property in California," did not "advertise or otherwise solicit business in California," "did not create, control, or employ the distribution system that brought its valves to California," and did not "design[] its product in anticipation of sales in California." 480 U.S. at 112–13. At most, Asahi was merely aware that some of its tire valves, sold to a Taiwanese company, were used in tire tubes sold in California. 480 U.S. at 112.

Concurring in the judgment, Justice Brennan argued that such "additional conduct" was not required because "[t]he stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale." 480 U.S. at 117. Justice Stevens, also concurring in the judgment, suggested that whether Asahi's "conduct rises to the level of purposeful availment requires a constitutional determination that is affected by the volume, the value, and the hazardous character of the components." 480 U.S. at 122.

The Supreme Court revisited the stream-of-commerce theory in *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011). Again no opinion commanded a

majority. Justice Kennedy's plurality opinion rejected Justice Brennan's proposed test in *Asahi* and emphasized that "[t]he defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State." 131 S.Ct. at 2788. Because J. McIntyre, an English manufacturer, had no contact with the forum except for the presence of a J. McIntyre machine (or possibly four machines) in New Jersey, the plaintiff failed to demonstrate that J. McIntyre purposefully availed itself of the New Jersey market. 131 S.Ct. at 2786, 2790.

Concurring in the judgment, Justice Breyer reasoned that no precedent "finds that a single isolated sale, even if accompanied by the kind of sales effort indicated here, is sufficient." 131 S.Ct. at 2792. Quoting from each of the three opinions in *Asahi*, Justice Breyer determined that the facts showed "no 'regular . . . flow' or 'regular course' of sales in New Jersey; and there is no 'something more,' such as special state-related design, advertising, advice, marketing, or anything else." 131 S.Ct. at 2792.

The Eleventh Circuit has declined to determine whether Justice O'Connor's "stream of commerce plus" test governs the minimum-contacts inquiry, although the court applied the test to hold that the exercise of jurisdiction was proper. *Vermeulen*,

985 F.2d at 1548 & n.17.  To date, the Eleventh Circuit has not addressed the stream-of-commerce theory in light of *J. McIntyre*.[3]

Westfalia insists that the sale of a crane to WTI in Germany falls far short of equalling a purposeful activity in Florida.  The plaintiffs counter that, among other activities, Westfalia built-to-order at least four cranes for three Florida buyers.  Further, the plaintiffs maintain that Westfalia possesses the requisite minimum contacts with Florida even measured against the more demanding standard articulated in *Asahi* and *J. McIntyre*.

Westfalia is a German corporation with headquarters in Germany.  (Doc. 34-1, "Gartemann Dec." at ¶ 4)  Westfalia's managing director, Andreas Gartemann, denies any corporate presence in Florida.  (Gartemann Dec. at ¶¶ 7–27)  For instance, Westfalia has no employees, no offices, no bank accounts, no telephone listings, and no real property in Florida.  Westfalia has never advertised or solicited business in Florida, has never been required to pay taxes in Florida, and has never maintained in Florida a registered agent for service of process.

---

[3] At least three Circuit Courts of Appeals have concluded that under *Marks v. United States*, 430 U.S. 188, 193 (1977), Justice Breyer's concurring opinion "furnished the narrowest grounds for the decision and controls." *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521, 541 (5th Cir. 2014) (internal quotation marks omitted); *accord Williams v. Romarm, SA*, 756 F.3d 777, 784 (D.C. Cir. 2014); *AFTG-TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1363 (Fed. Cir. 2012). "[T]he narrowest ground, as expressed in Justice Breyer's concurrence, is that the law remains the same after *McIntyre*, and that circuit courts may continue to attempt to reconcile the Supreme Court's competing articulations of the stream of commerce test." *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d at 541.

WTI, a Pennsylvania corporation (and Brown's employer), is the exclusive distributor for Westfalia's products in the United States. (Doc. 50-2 "Labell Dep." at 35-36; Gartemann Dec. at ¶ 5)  WTI and Westfalia have no formal corporate connection. (Gartemann Dec. at ¶ 5)  WTI was founded in 1992 by Westfalia's sole owner, Ulrich Upmeyer; his nephew, Daniel Labell; and a third person, Ted Elicker. (Labell Dep. at 16–17, 22)  Labell is WTI's president. (Labell Dep. at 21). According to Labell, WTI portrays itself as a partner of Westfalia "from a marketing perspective." (Labell Dep. at 73)  Westfalia's website claims a global, corporate workforce of three hundred, which, Labell testified, includes WTI's employees. (Labell Dep. at 70–71)

WTI obtained the Pepsi project after a WTI sales manager heard that Pepsi might build a warehouse. (Labell Dep. at 85–86)  WTI visited the Pepsi site and developed a concept for the automated storage retrieval system (AS/RS). (Labell Dep. at 88–89)  The AS/RS cost approximately $7.5 million. (Labell Dep. at 40–41)  The price included the two cranes from Westfalia, which cost 513,175.00 euros (about $820,000). (Labell Dep. at 41, Doc. 50-7 at 2, Doc. 60 at ¶ 8)  The cranes were the only items ordered from Germany. (Labell Dep. at 91)  WTI used in-house stock for the remaining components. (Labell Dep. at 91)

WTI sought no advice from Germany on system requirements for the Pepsi warehouse. (Labell Dep. at 93–94)  WTI provided drawings to Westfalia, and Westfalia built the cranes to the requested height and payload. (Labell Dep. at

54–55, 133–34)  Westfalia manufactured-to-order each of the crane components, including the double mast, the VLS platform, and a satellite.  (Labell Dep. at 176–78)

According to Labell, Westfalia knew that WTI ordered the cranes for installation in Tampa, Florida.  (Labell Dep. at 99, 105–06)  A December 20, 2007 purchase order prepared by WTI and transmitted to Westfalia specifies shipment to "The Pepsi Beverages Company" at "11315 N. 30th Street, Tampa, FL 33612." (Labell Dep. at 95–97, Doc. 50-6 at 25)  Westfalia's order confirmation describes the project as "The Pepsi Bottling Group, Florida" for delivery in "Tampa, FL USA." (Labell Dep. at 127–28, Doc. 50-7 at 2, 5)

The purchase order specifies that the shipment is "FOB" Port Bremerhaven, Germany.  (Doc. 50-6 at 25, Doc. 55-1 "Redecker Dec." at ¶¶ 2–3)  WTI took possession of the cranes in Bremerhaven.  (Redecker Dec. at ¶ 2)  WTI's purchasing department worked with Westfalia to coordinate the transfer.  (Labell Dep. at 101) The containers in which Westfalia shipped the cranes were not changed.  (Labell Dep. at 101–02)

Westfalia delivered the cranes' manuals to WTI, and WTI delivered the manuals, along with other documentation, to Pepsi.  (Labell Dep. at 116–17) Westfalia is listed as a vendor for spare parts, and WTI's customers understand that spare parts for the cranes may come from Germany.  (Labell Dep. at 122–24, 141–42, 150)  While Brown was repairing the crane at the Pepsi warehouse, Westfalia shipped a replacement chain directly to Tampa.  (Labell Dep. at 194,

Doc. 60 at ¶¶ 20, 37, 45)  In performing service work, WTI's technicians may consult, if necessary, with Westfalia.  (Labell Dep. at 124–25)

Although not present when WTI installed the cranes at the Pepsi warehouse, German representatives visited the warehouse after the accident.  (Labell Dep. at 118)  WTI did not have the personnel necessary to get the machines back in operation and requested help from Westfalia.  (Labell Dep. at 118–19)  According to Labell, Westfalia was "very curious to determine the cause of the accident and, you know, were very helpful and wanted to also, I think, send people to the site."  (Labell Dep. at 118)  WTI paid Westfalia for the services provided by Westfalia's technicians.  (Gartemann Dec. at ¶ 28)

WTI ordered cranes from Westfalia for two other Florida projects.  WTI's first Florida customer, Automated Self Storage Systems, required a single crane capable of carrying heavy loads.  (Labell Dep. at 147–49)  The crane cost 576,000 euros.  (Labell Dep. at 149)  Westfalia directly shipped the crane to a port in Florida.  (Labell Dep. at 156–57)  According to Klaus Redecker, the head of personnel at Westfalia, the crane shipped "CFR" with both the risk of loss and the title transferring to WTI at the German port of shipment.  (Redecker Dec. at ¶ 3)

WTI also installed a Westfalia crane at a storage facility owned by RoboVault.  (Labell Dep. at 135–38)  The RoboVault project required a single crane capable of handling 16,000-pound loads and Westfalia built the crane as specified.  (Labell Dep. at 138–39)  The crane cost 543,000 euros.  (Labell Dep. at 138)  Before the shipment

RoboVault saw the crane operating on a test track in Germany, but RoboVault had no other "contact" with Germany. (Labell Dep. at 140–41) Labell testified, based on his understanding of the sales documents, that Westfalia shipped the crane directly to Fort Lauderdale, Florida. (Labell Dep. at 142–44, Doc. 50-8 at 13) Redecker declares that similar to the Pepsi project the shipment was "FOB Bremerhaven." (Redecker Dec. at ¶ 3 & Exh. 2)

In sum, the record demonstrates that Westfalia established at least minimal commercial contacts with Florida, that those contacts are directly connected to the subject of the instant action, that Westfalia purposefully availed itself of commercial opportunity and activity in Florida, and that Westfalia could reasonably anticipate being haled into a Florida court. *Burger King Corp.*, 471 U.S. at 476; *Vermeulen,* 985 F.2d at 1546. Westfalia built-to-order four cranes, knowing that the cranes were destined for Florida. Westfalia itself delivered the crane for Automated Self Storage Systems to Florida and packaged the other cranes for delivery to Florida. Further, Westfalia retained some responsibility to WTI's customers after the cranes reached Florida. Westfalia was identified as a spare-parts vendor, and Westfalia was available to provide technical assistance to WTI. Westfalia sent a replacement chain directly to the Pepsi warehouse in Florida, and Westfalia sent employees to Florida to repair the crane after Brown's accident. Although Westfalia's volume of sales was small, the value of the cranes was substantial — with each project priced at over

500,000.00 euros.  As the plaintiffs note, Westfalia retains an additional expectation of profits from the sale of spare parts.

Westfalia's contact with Florida surpasses a mere "awareness" that Westfalia's cranes might travel to Florida.  In contrast to *Asahi* and *J. McIntyre*, Westfalia manufactured products in anticipation of sales in Florida, Westfalia used an exclusive U.S. distributor to complete shipment of products to Florida, and Westfalia had additional, direct contact with Florida through the provision of spare parts and technical assistance.  In short, the record establishes the circumstance contemplated by the Supreme Court in *Volkswagen*: a manufacturer that seeks to "serve directly or indirectly" the market for products in the forum state.  444 U.S. at 297.

Further, the exercise of jurisdiction over Westfalia will not offend fair play or substantial justice, which require consideration of:

> the burden on the defendant in defending the lawsuit, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies and the shared interest of the states in furthering fundamental substantive social policies.

*Madara v. Hall*, 916 F.2d 1510, 1517 (11th Cir. 1990).  While litigation in Florida necessarily involves inconvenience to Westfalia as a non-resident litigant (of course, the plaintiffs are Pennsylvania residents), resolution in a single action of each claim by and against each party effects a singular preservation of resources.  *Vermeulen*, 985 F.2d at 1552.

## CONCLUSION

Because Florida's exercise of jurisdiction over Westfalia is proper, the motion to dismiss (Doc. 32) is **DENIED**.  Westfalia's request (Doc. 33) for oral argument is also denied.

ORDERED in Tampa, Florida, on February 4, 2016.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE